STATE OF WEST VIRGINIA *ex rel.* HAROLD D. ANDERSON

*v.*

AUGUST L. DAILER, *Clerk, etc.*

(No. 10717)

Submitted January 18, 1955. Decided February 15, 1955.

*Chester R. Hubbard,* for relator.

*Charles P. Mead,* for respondent.

RILEY, JUDGE:

In this proceeding in mandamus of the petitioner, State of West Virginia ex rel, Harold D. Anderson, against August L. Dailer, Clerk of the City of Wheeling, a municipal corporation, respondent, the relator, Harold D. Anderson, a citizen, resident and taxpayer of the City of Wheeling, on behalf of himself as a citizen, resident and taxpayer of the City of Wheeling and on behalf of all other citizens, residents and taxpayers, who join in this proceeding and agree to show cause therefor, seeks to require the respondent clerk, August L. Dailer, to countersign revenue bonds in the amount of twelve million dollars, as provided in the ordinance of the Council of the City of Wheeling adopted on November 23, 1954, the issuance of which revenue bonds was authorized for the purpose of financing the cost of the construction of a bridge and tunnel facility, designed to provide a direct connection with a point on United States Route No. 40, in the suburban

section of the City of Wheeling, known as "Glenwood", with the eastern terminal of a bridge, which is now under construction by the state road commission, from the intersection of U. S. Route No. 40 at Ninth and Market Streets in the City of Wheeling across the Ohio River to that part of the city known as "Wheeling Island".

On November 23, 1954, the Council of the City of Wheeling adopted an ordinance, hereinafter at times referred to as the "ordinance", authorizing the construction of a bridge and tunnel facility, connecting U. S. Route No. 40 with Market Street at Ninth Street in the City of Wheeling; providing for a direct connection with the Ohio River Bridge, now under construction, at Ninth Street, and authorizing the issuance of revenue bonds of the City of Wheeling in the amount of twelve million dollars, under the provisions of Chapter 27, Acts of the Legislature, Second Extraordinary Session, 1933, hereinafter at times referred to as "Chapter 27".

By this ordinance the Council of the City of Wheeling made the following findings:

"(A) That it will be in the best interest of the inhabitants of the City of Wheeling, the County of Ohio, and State of West Virginia, for the City of Wheeling to construct and establish a bridge and tunnel facility connecting U. S. Route 40 with Market Street at 9th Street in the City of Wheeling and providing a direct connection with the Ohio River bridge currently under construction at 9th Street, together with the necessary approaches and appurtenances thereto, and all facilities and equipment for the operation thereof. (Hereinafter collectively referred to as "Project".)

"(B) That the estimated net earnings from said Project, over and above the necessary cost of operating and maintaining the same, will be sufficient to pay the principal of and interest on all of the Bonds issued pursuant to this ordinance and to make all reserve, sinking fund and other payments provided for in this ordinance.

"(C) That the principal of and interest on the Bonds to be issued pursuant to this ordinance and

all of the reserve, sinking fund and other payments provided for in this ordinance, will be paid solely from the revenues derived from the operation of said Project by the City of Wheeling and the Bonds issued pursuant to this ordinance shall not constitute a debt or charge against the State of West Virginia, or the County of Ohio, or the City of Wheeling or any political subdivision of said State.

"(D) That said Project shall be constructed and established substantially in accordance with the plans and specifications prepared by Knappen, Tippetts, Abbett and McCarthy, Consulting Engineers, of New York, N. Y., and hereafter filed with and approved by the City of Wheeling at an estimated cost of $12,000,000. Such cost shall be deemed to include the cost of labor, materials, equipment, contractors' bonuses and extras, if any, furnishings, and all lands, and any interest therein, and of any other properties, real or personal or mixed, tangible or intangible, necessary, appurtenant or incidental in the construction and establishment of said Project; interest upon Bonds issued pursuant to this ordinance prior to and during and for six months after the completion of said Project, to the full extent that revenues or other funds available are insufficient therefor; engineering expenses, legal expenses, expenses for estimates of cost and of revenues; advertising expenses; contingent expenses; fees for financial services; expenses for plans, specifications and surveys; administrative expenses of the City and the cost of operation and maintenance of said Project for a reasonable period after the completion of said Project, in such amounts as shall be certified to be necessary therefor by the Consulting Engineer; discount, if any, upon the sale of said Bonds, the cost of insurance prior to the completion of said Project; and such other expenses as may be necessary to the financing authorized by this ordinance and the construction and establishment of said Project; and the placing of same in operation."

The petition alleges that on November 14, 1954, the City of Wheeling entered into a contract with North American Construction Corporation, a corporation, orga-

nized and existing under the laws of the State of Delaware, under the terms of which it was agreed that North American Construction Corporation would, for and on behalf of the City of Wheeling, construct, or have constructed, a bridge and tunnel facility, together with the necessary and proper approaches and appurtenances thereto; that the contract was entered into between the City of Wheeling and North American Construction Corporation to eliminate the lines and grades which now produce a hazardous and congested movement of traffic in the downtown section of the City of Wheeling; and that in order that the traffic congestion may be eliminated and that both local and transient traffic may hereafter be permitted to make the maximum use of the new bridge, known as the "Ohio River Bridge", now under construction by the State Road Commission of West Virginia, from a point on Wheeling Island to a point on that street within the City of Wheeling known as "Market Street" at its intersection with Ninth Street.

The petition alleges that the bridge now being constructed by the state road commission across the Ohio River is the first unit of a bridge facility connecting the City of Wheeling with the Village of Bridgeport, Belmont County, Ohio; that such bridge constitutes a portion of U. S. Route No. 40 and U. S. Route No. 250, the former being the route traversed by traffic proceeding in an easterly and westerly direction to and from the City of Wheeling, and the latter being the route used by vehicular traffic proceeding to and from the City of Wheeling in a southeasterly and northwesterly direction; and that the Ohio River Bridge, when constructed, will serve vehicular traffic proceeding to and from West Virginia Route No. 2 through the medium of ramps, which are now being constructed on the west side of Main Street, within the City of Wheeling, and the estimated average daily volume of vehicular traffic proceeding to or from the Ohio River Bridge, now under construction, is approximately nineteen thousand vehicles.

The petition alleges that U. S. Route No. 40, which is commonly known as the "National Road", and U. S. Route No. 250 now proceed across the Ohio River from the City of Wheeling to Wheeling Island, and thence from Wheeling Island to the State of Ohio by way of four bridges, namely: a bridge suspended by cables, known as the "Suspension Bridge", and a bridge erected by the use of steel girders, known as the "Steel Bridge," both of which connect the City of Wheeling proper with Wheeling Island; and bridges known and designated in the petition, respectively, as the "Bridgeport Bridge" and the "Aetnaville Bridge", which last-mentioned bridges connect Wheeling Island with the State of Ohio.

The petition alleges that the Suspension Bridge is limited to light vehicular traffic; that the Steel Bridge is limited to vehicular traffic having load limits of not more than ten tons for a vehicle with two axles, and sixteen tons for a vehicle with three axles; and that, as a consequence, all of the vehicles proceeding east and west on U. S. Route No. 40 or U. S. Route No. 250 having load limits in excess of those hereinabove set forth, are required to cross the Ohio River by way of the Benwood-Bellaire Bridge, a toll bridge situated approximately five miles south of the new Ohio River Bridge, now under construction.

It is alleged in the petition that when the Ohio River Bridge from Ninth and Market Streets in the City of Wheeling to Wheeling Island has been completed, vehicles proceeding over U. S. Route No. 40 and U. S. Route No. 250, having load limits in excess of those limits hereinabove set forth, will use the new high level bridge, now being constructed, to Wheeling Island, in that the new bridge is being constructed so as to accommodate all vehicles, regardless of weight.

The petitioner further alleges that he is advised that vehicles proceeding over said routes, having weights in excess of those limits hereinabove set forth, will use the Ninth and Market Street Bridge, if they are proceeding in

an easterly or northwesterly direction, in that the distances to be travelled by vehicles, if they use said bridge, will be less than the distances presently travelled by said vehicles using said Benwood-Bellaire Bridge, and for the further reason that vehicles using the new bridge will, so the petition alleges, hereafter be using a free bridge in contrast with a toll bridge.

It is alleged in the petition that upon the completion of the Ohio River Bridge, now being constructed at Ninth and Market Streets, in the City of Wheeling, the aforementioned Suspension and Steel Bridges will be dismantled and closed to traffic.

It is further alleged in the petition that the aforementioned additional vehicular traffic, which will use the new Ohio River Bridge, now being constructed at Ninth and Market Streets, within the City of Wheeling, will increase the present traffic in the downtown district of Wheeling to the extent that the new bridge rather than becoming an asset to the City of Wheeling and to the owners of vehicles proceeding over the same, will, in fact, become a liability to the City of Wheeling and to the owners of vehicles, unless the proposed bridge and tunnel traffic connection to and from the Ohio River high level bridge, now under construction, is made available.

The petition further alleges that without considering the increased traffic congestion which will occur upon the completion of the new Ohio River Bridge at Ninth Street in the City of Wheeling, the construction of the proposed bridge and tunnel facility connecting U. S. Route No. 40 at the suburban section of the City of Wheeling, known as "Glenwood", with Market Street at Ninth Street in the City of Wheeling, will be of material benefit to the City of Wheeling, and of benefit to local and transient traffic. In this regard there is attached to the petition as an exhibit, a copy of a letter, dated November 29, 1954, from Knappen, Tippetts, Abbett and McCarthy Engineering Company, consulting engineers, which, by stipulation, is made a part of the record.

In the appraisal of the validity of the revenue bonds and the ordinance of the City of Wheeling, now under consideration by this Court, it is unnecessary to state in detail the contents of the letter of November 29, 1954, made a part of the petition in this proceeding, except in a general way. This letter deals in detail with existing conditions, the Ohio River Bridge, now being constructed at Ninth Street, and the proposed tunnel, bridge or viaduct project under consideration.

As this letter of November 29, 1954, has been made a part of the petition by stipulation, we take as true the statements contained therein, in the absence of any pleading or exhibit made a part of the record stating a contrariwise view. This being so, from the proposed eastern terminus of the proposed tunnel and bridge facility traffic in a westerly direction on U. S. Route No. 40 traverses an 8.4 grade for a distance of about four-tenths of a mile in length to the top of a hill immediately east of the terminus of the new bridge, known as "Wheeling Hill". From that point on the top of Wheeling Hill the present route for traffic in the area east of Wheeling bound to and from areas north of the central business section is by the National Road, "which is dangerously narrow and has grades in the order of 7%. From the top of Wheeling Hill traffic of points to the west, Ohio and beyond, and traffic of the south, the central business district of Wheeling and beyond, travels via Chapline Street which has grades of about 5%. The traffic to the west diverges from Chapline Street to Memorial Boulevard which has grades in the order of 10%."

Two old and inefficient bridges now span the east channel of the Ohio River at Wheeling. The combined capacity of these bridges is inadequate for the present demands, and neither of these is safe for conventional heavy truck loads. These deficiencies are being corrected by the construction of a new bridge over the east channel of the Ohio River along an alignment corresponding to an extension of Ninth Street in the City of Wheeling. This bridge and its easterly approaches will separate to some

extent the U. S. Route No. 40 traffic and Ohio Route No. 2 traffic. However, with the present alignment of U. S. Route No. 40 in Wheeling, the new bridge route will require more devious travel for the greater part of the east-west traffic through Wheeling, resulting in more turning movements at the busy Tenth Street intersections. The elimination of this through traffic from the city streets is one of the more urgent needs for the relief of the Wheeling traffic situation.

The consulting engineers' letter further states that the proposed tunnel and bridge project will be a direct continuation of the alignment of the new Ohio River Bridge at Ninth Street, and the project would connect to the City street pattern by free-flowing ramps. The entire improvement would have fully controlled access and would be fully grade separated.

Further from the consulting engineers' letter it appears that the proposed project will have the following principal accomplishments in so far as relief of traffic is concerned:

"1. The present serious intersection problem at the junction of Memorial Boulevard and Chapline Street would be relieved by the elimination from that intersection of the east-west traffic of U. S. Route 40. That traffic now crosses the traffic of Chapline Street at a dangerously acute angle. With the construction of the proposed improvement, there would be little divergence and crossing of traffic at this point.

"2. The present serious intersection problems which result from the crossing at grade of Market and Main Streets by the east-west traffic of U. S. Route 40 would be eliminated by the grade separation features of the improvement.

"3. The present hazardous travel over National Road would be unnecessary for traffic moving between U. S. Route 40 on the east and areas to the north along the Ohio River. The proposed improvement would provide a direct connection to the routes paralleling the river.

"4. The delays and danger caused by wet or icy conditions on the steep grades of the present routes would be eliminated.

"5. City streets would not be burdened by peak traffic resulting from large volumes of tourist travel and from spectator events on Wheeling Island, leaving the city streets available for service to local business.

"6. Accident potential for the traffic movements involved would be reduced by the limited access characteristics of the improvement."

The petition further alleges that the revenue bond ordinance was enacted by the Council of the City of Wheeling on November 23, 1954, under the authority vested in the Council by the provisions of Chapter 27, now contained in Michie's West Virginia Code, 1949, Anno., 17-17-30, 31, 32, 33 and 34.

Finally the petition alleges that under the provisions of the ordinance the revenue bonds provided for therein are required to be signed on behalf of the City of Wheeling by its Mayor and are to be coutersigned by the City Clerk, who, the petition alleges, is the respondent, August L. Dailer, but notwithstanding the duties imposed upon the respondent as City Clerk, the petition alleges that the respondent has advised he will not countersign the revenue bonds in that he is in doubt as to the right of the City of Wheeling to issue the bonds under the terms of Chapter 27.

The position of the respondent Clerk of the City of Wheeling is that, while he concedes that the City of Wheeling may issue revenue bonds to construct a toll bridge or bridges and approaches thereto over Wheeling Creek, he is in doubt whether any portion of the moneys received from the sale of such revenue bonds may be used for the construction of a tunnel or tunnels, connecting the proposed bridges or viaducts over Wheeling Creek with the aforementioned Ohio River Bridge at Ninth and Market Streets within the City of Wheeling.

From the petition and "Exhibit B" to the petition, which is a plat showing the plan, sections and profiles of the proposed project, made by the consulting engineers, which plat is also made a part of the record by the stipulation, it appears that the proposed project at the easterly end

thereof consists of an approach leading from U. S. Route No. 40 near Merwin Street in the suburban part of the City of Wheeling, commonly known as "Glenwood" to a toll plaza, which plaza is six hundred feet, more or less, in length; and thence proceeding in a westerly direction a distance, as determined by scale on the plat, of about eighteen feet to a proposed bridge crossing Wheeling Creek one hundred seventy feet, more or less, in length; thence, as ascertained by scale a distance of about twenty feet to the east portal of a proposed tunnel running under a hill, commonly known as "Peninsula Hill" to the west portal of the tunnel, a distance of two hundred ninety feet, more or less; thence again proceeding in a westerly direction a distance, as determined by scale on the plat, of about eighteen feet to a viaduct across Wheeling Creek and a closely built residential section of the City of Wheeling, a distance of one thousand, two hundred and ten feet; thence in a westerly direction a short distance, as ascertained by scale on the plat, a distance of about eighteen feet to the east portal of a tunnel proceeding in a westerly direction under a high hill, described in the petition as "Wheeling Hill"; thence again proceeding in a westerly direction through a tunnel a distance of one thousand, four hundred twenty-five feet, more or less, to the west portal of the tunnel, which west portal is under Chapline Street Extension in the City of Wheeling, and a ramp leading from Tenth Street in the City of Wheeling to the Chapline Street Extension; and thence, as ascertained by scale, about forty feet along Ninth Street in the City of Wheeling, to the easterly terminus of the Ohio River Bridge, now under construction, which point of contact with the Ohio River Bridge is within what is designated on the plat as the westerly interchange, within which is the approach to the proposed project leading from the Ohio River Bridge; a ramp leading in a northerly direction to the street level of Market Street in the City of Wheeling, a ramp leading in a southerly direction to Market Street in the City of Wheeling, a short distance north of Tenth Street, and a ramp leading from a point

near the intersection of Tenth and Market Streets in the City of Wheeling to a point on the project a short distance west of the west portal of the last-mentioned tunnel. As shown by the plat and the allegations of the petition, the proposed bridge and tunnel facility is designed to serve vehicular traffic travelling from Market and Tenth Streets in the City of Wheeling westerly from the westerly interchange of the proposed project on the Ohio River Bridge, and a ramp leading in a northerly direction from the proposed project to Market Street.

By letter, dated December 15, 1954, addressed to Robert L. Plummer, City Manager of the City of Wheeling, filed with the petition as "Exhibit D" and made a part of the record by stipulation, the state road commission, acting through Honorable H. K. Griffith, state road commissioner, approved the construction of the project, subject to the following conditions: (1) A decision of a court of competent jurisdiction to the effect that the state road commission has authority to approve the project; (2) that the state road commission reserves the right to approve design geometrics; the general location and specific terminal connection location; and (3) that the approval of the state road commission will not in any way obligate the State Road Commission of West Virginia, or the State of West Virginia to the expenditure of any funds, or constitute a financial responsibility of any kind or character of the commission or the State of West Virginia.

To the petition the respondent, August L. Dailer, Clerk of the City of Wheeling, filed an answer, in which he admits as true all the allegations of the petition, except that respondent expresses in his answer his doubt as to the right of the City of Wheeling to issue revenue bonds to defray the cost of constructing a tunnel or tunnels connecting the proposed bridges over Wheeling Creek with the Ohio River Bridge, now under construction at Ninth and Market Streets in the City of Wheeling.

The material parts of Sections 1, 3 and 4 of Chapter 27, Acts of the Legislature, Second Extraordinary Session,

1933, now contained in Michie's Code, 1949, Anno., 17-17-30, 32 and 33, by virtue of which the City of Wheeling and its Council claim the power and authority to construct the bridge and tunnels and issue the revenue bonds under the revenue bond ordinance are:

"(1) Any incorporated city, in which or adjoining which there is a portion of a navigable or non-navigable river or stream, * * *, is hereby authorized and empowered, in its corporate capacity, or through and by means of a bridge commission or other agency to be created or appointed by it, to construct, maintain and operate a highway toll bridge over and across such river or stream, from such a point within the corporate limits of such city, to such point on the opposite side of such river or stream, * * * as the said city, through its proper authorities, shall designate and select, for public use in travel, passage and transportation, over and across such river or stream: *Provided, however,* That no bridge shall be constructed, established or operated, over and across any navigable river, without compliance with the requirements, conditions and provisions provided by the Congress of the United States and the laws of the United States, nor without approval of the state road commission of this state; and such city is authorized and empowered to borrow money by means of bonds payable from revenues, or otherwise, and/or to accept grants in part payment therefor from the reconstruction finance corporation, public works administration, or any other governmental agency authorized to make loans, a sum of money sufficient and necessary to pay all costs of construction of such bridge, including approaches thereto, the acquisition of all necessary rights-of-way and all engineering, legal and other expenses necessary thereto or connected therewith, including interest during construction, as a self-liquidating enterprise or project, within the meaning of the federal laws authorizing loans by such reconstruction finance corporation, or other governmental agency. * * *

"(3) Any city or county court authorized and empowered by this act to construct or purchase and maintain and operate such highway toll bridge, is further authorized and empowered to

do and perform any and all acts and make all contracts necessary to effectuate the general purposes of this act, including the acquisition, by original grant, purchase, condemnation or other lawful means, of all necessary permits, franchises, licenses, rights-of-way, easements and other rights in real estate, and title to and possession thereof, and/or to make such purchase, with the money borrowed as provided in section one of this act, or otherwise. Such city or county court shall have authority to make such contracts, agreements and covenants between it and said reconstruction finance corporation, public works administration, or other governmental agency, for the loan of said funds and securing payment thereof, as they may be able to effectuate, subject only to this limitation, that the bonds or other evidences of indebtedness issued or given as security therefor shall be payable solely out of the revenues of such bridge; and to construct, own, operate and maintain such bridge over and across such river or stream, and to make and enter into such contracts, and to do and perform such acts as may be necessary to the construction, and/or purchase, ownership, operation and maintenance of such bridge, subject to such burdens, restrictions and encumbrances as it may be necessary to incur and bear, in securing such funds for construction, including the creation by mortgage or deed of trust, on the said bridge, its equipment, tolls and revenues and franchise, and also subject to the laws of this State and the United States, relating to toll bridges over and across navigable streams, insofar as they are applicable to such bridges. Bonds, or other evidences of indebtedness, issued hereunder, shall be exempt from taxation by the state of West Virginia or any county, district or municipality thereof.

"(4) In the event bonds, or other evidences of indebtedness, issued under the provisions of this act, are not secured by a mortgage or deed of trust on the bridge acquired from the sale of such bonds, or other evidences of indebtedness, there shall be, and there is hereby, created a statutory mortgage lien upon the bridge and approaches so acquired or constructed from the proceeds of bonds, or other evidences of indebtedness, authorized to be

issued, which shall exist in favor of the holder of said bonds, and each of them, and to and in favor of the holder of the coupons attached to said bonds, and such bridge and approaches thereto shall remain subject to such statutory mortgage lien until payment in full of the principal and interest of said bonds, or other evidences of indebtedness. Any holder of bonds, or other evidences of indebteness, issued under the provisions of this act, or of any coupons representing interest accrued thereon, may, either at law or in equity, enforce the statutory mortgage lien hereby conferred, and may, by proper suit, compel the performance of the duties of the officials of the issuing municipality or county court set forth in this act. If there be default in the payment of the principal of and/or interest upon any of said bonds, or other evidences of indebtedness, any court having jurisdiction in any proper action may appoint a receiver to administer said bridge on behalf of the municipality or county court, with power to charge and collect rates sufficient to provide for the payment of said bonds, or other evidences of indebtedness and interest thereon, and for the payment of the operating expenses and to apply the income and revenues in conformity with this act and the order or ordinance providing for the issuance of said bonds, or other evidences of indebtedness."

Initially, we hold that the Legislature by the enactment of Chapter 27 has effectively delegated to the City of Wheeling and other municipalities in the State, the power to construct, maintain and operate highway toll bridges and approaches thereto over and across any navigable or non-navigable river or stream, which is wholly within the State of West Virginia, or partly within the State, or between the State of West Virginia and any other state "from such a point within the corporate limits of such city, to such point on the opposite side of such river or stream, either within or without said City, as the said city, through its proper authorities, shall designate and select, for public use in travel, passage and transportation, over and across such river or stream"; and finance the cost thereof by the issuance of bonds secured by the revenues

derived therefrom. *State ex rel. Knight* v. *Hanway, Mayor of the City of Fairmont,* 136 W. Va. 219, 67 S. E. 2d 1. In point 2 of the syllabus of the *Knight* case, this Court held that Chapter 27 serves to vest a municipal corporation "with power to provide necessary approaches to a toll bridge * * *, including the construction of a viaduct, notwithstanding a part of such approaches and improvements may be approximately one-half mile from the bridge structure, and the city may pay for the same from proceeds received from revenue bonds, it appearing that such approaches and improvements are reasonably necessary to the full use and capacity of the bridge and the maximum safety in the use thereof." To the effect that the approaches to a bridge are not necessarily confined to distances from bridge structures proper, see *State ex rel. Washington Toll Bridge Authority* v. *Yelle, Auditor,* 197 Wash. 110, 84 P. 2d 688; *In the Matter of the City of New York,* 174 N. Y. 26, 66 N. E. 584; *Howington* v. *Madison County,* 126 Ga. 699, 55 S. E. 941, 942; *Roby* v. *Appanoose County,* 63 Iowa 113, 18 N. W. 711, 713; *Schaefer* v. *Zangerle,* 43 Ohio App. 30, 182 N. E. 644, 646; *Kolacki* v. *State,* 240 N.Y.S. 677, 678, 136 Misc. 239; *State ex rel. Knight* v. *Hanway, Mayor, supra;* 10 McQuillin, Municipal Corporations, 3d Ed., Section 30.07.

To the effect that the early English doctrine that approaches to a bridge extend no farther than three hundred feet from the bridge structure, which grew out of the enactment of 22 Hen. 8, C. 5; S. 9, which statute provided that one charged with constructing, maintaining and repairing bridges was required to keep in proper repair the roadway for a distance of three hundred feet, has never been followed in this country, see 8 Am. Jur., Bridges, Section 3; 4 R. C. L., Bridges, Section 2; *State ex rel. Knight* v. *Hanway, supra,* page 229. See, however, the case of *Board of Commissioners of Rush County* v. *Rushville and Vienna Gravel Road Co.,* 87 Ind. 502, 505, in which the Court held that the approaches to a bridge within reasonable limits—perhaps three hundred feet—constitute a part of the bridge.

Chapter 27 having been enacted in the exercise of the police power of the State, and being remedial in its nature, should be liberally construed to effectuate the legislative intent. See *State ex rel. Bibb* v. *Chambers*, 138 W. Va. 701, 77 S. E. 2d 297; and *State ex rel. Holbert* v. *Robinson, Mayor*, 134 W. Va. 524, 59 S. E. 2d 884, in which cases, however, the statute under consideration, Section 27, Chapter 68, Acts of the Legislature, Regular Session, 1935, expressly provided that the statute "shall be liberally construed to effectuate the purposes thereof." To the effect that the Legislature may delegate to a municipal corporation the exercise of its inherent police power, subject to the control of the courts, but only to the extent that the courts have the power to act, see *Hayes* v. *Town of Cedar Grove*, 126 W. Va. 828, 30 S. E. 2d 726, 156 A. L. R. 702; *State ex rel. Bibb* v. *Chambers, supra.*

There are many decisions of this Court which hold that the Legislature has the power to confer upon municipal corporations authority to construct bridges, automobile parking facilities, public hospitals, flood walls, sewer systems, and other public improvements. *State ex rel. Bibb* v. *Chambers, supra; State ex rel. Knight* v. *Hanway, Mayor, supra; State ex rel. Holbert* v. *Robinson, Mayor, supra; Warden* v. *City of Grafton*, 125 W. Va. 658, 26 S. E. 2d 1; *Duling Bros.* v. *The City of Huntington*, 120 W. Va. 85, 196 S. E. 552; *Brewer* v. *City of Point Pleasant*, 114 W. Va. 572, 172 S. E. 717; and *Casto et al.* v. *Town of Ripley*, 114 W. Va. 668, 173 S. E. 886.

Applying the liberality rule invoked in the interpretation and application of statutes such as Chapter 27, and relying specifically upon the holding of this Court in the *Knight* case, we are of the opinion that the City of Wheeling under and by virtue of Chapter 27 is vested with the power to construct the two bridges in the proposed project over Wheeling Creek, as shown by the plat filed as "Exhibit B" with the petition, as well as the proposed connecting tunnels, and may pay for the same from proceeds received from revenue bonds, if it appears from the provisions of the ordinance and the allegations of the

petition, not controverted by the answer, that the bridges and tunnels are reasonably necessary to the full use of the new Ohio River Bridge and the maximum safety in the use thereof.

The proposed project, as heretofore indicated, consists of two bridges over Wheeling Creek, both of which are to be served by tunnels through Wheeling Hill and the hill commonly known as "Peninsula Hill". This record clearly discloses that the use of the tunnels is necessary to connect the two bridges over Wheeling Creek and the western terminus of the new Ohio River Bridge with the point at or near the foot of Wheeling Hill on U. S. Route No. 40, in the suburban area of Wheeling known as "Glenwood", for the reason, as the petition alleges, that the cost of making cuts through Wheeling Hill and Peninsula Hill, in lieu of the tunnels proposed to be constructed, would be prohibitive.

This Court having held in the *Knight* case that by virtue of Chapter 27 a municipal corporation is vested with power to provide necessary approaches to a toll bridge and make improvements thereof, including the construction of a viaduct, where it appears that such approaches and improvements are reasonably necessary to use of the full capacity of the bridge and the maximum safety in the use thereof, the City of Wheeling, in our opinion, may, under the provisions of Chapter 27, construct the two bridges over Wheeling Creek and the proposed tunnels through Wheeling Hill and Peninsula Hill, and may construct the approaches to the same, provided, of course, that the public welfare will be served thereby, and that the proposed bridge and tunnel facility is reasonably necessary to the use of the full capacity and the maximum safety in the use of the new Ohio River Bridge.

In the *Knight* case this Court did not have before it the exact question presented by this record. This Court in the *Knight* case simply held that a municipal corporation, under the police power delegated to it by the Legislature by Chapter 27, may provide necessary approaches to a toll bridge over a stream, in that case a navigable stream, and

make proper improvements thereof, including a viaduct, notwithstanding a part of such approaches and improvements may be approximately one-half mile from the bridge structure, and may pay for the same from proceeds received from revenue bonds, the only condition being that the "approaches and improvements are reasonably necessary to the full use and capacity of the bridge and the maximum safety in the use thereof". There is, however, nothing in the decision in the *Knight* case, which suggests any inhibition on the part of a municipal corporation, acting under the power delegated to it by Chapter 27, from constructing a tunnel or tunnels as an approach to a bridge, already constructed or to be constructed, which is a part of the public highway system. No provision of Chapter 27, either expressly or by legislative implication, inhibits a municipal corporation under its delegated powers from constructing a tunnel or tunnels for use as an approach to a bridge or bridges, which is a part of a public highway system extending within the corporate limits of a municipality, and the exact question is novel in this jurisdiction. In the case of *State ex rel. Washington Toll Bridge Authority* v. *Yelle, Auditor, supra,* the Supreme Court of Washington in a well reasoned case held that Chapter 173, page 654, Laws of Washington, 1937 (Rem. Rev. Stat. Sections 6524-1 to 6524-21), which vested the Washington Toll Bridge Authority with the power to provide "for the establishing and constructing of toll bridges upon any public highways of this state together with approaches thereto wherever the same is considered necessary or advantageous and practicable for crossing any stream, body of water * * *, or other topographical formation, whether the same is within this state or constitutes a boundary between this state and an adjoining state or country", embraced the power of the Washington Toll Bridge Authority in the exercise of the sound discretion vested in it by the statute, in determining the "approaches" to the Lake Washington Toll Bridge to include "a one-fourth mile long twin-bore tunnel, and arterial highway more than one mile long on one side of the bridge, and

highways on the other side of the bridge covering a distance of about three miles."

In the case at bar, however, we are not concerned with the two bridges over Wheeling Creek and the tunnels and approaches thereto as an isolated project: we are concerned here with an ordinance of the City of Wheeling and the validity of the revenue bonds in an overall project, which, as appears from the findings of the Council of the City of Wheeling, the ordinance itself and the allegations of the petition, will permit the flow of traffic from the eastern terminus of the new Ohio River Bridge at Ninth and Market Streets, through two high hills and across Wheeling Creek at two places to a point east of and beyond the business section of the City of Wheeling a distance of about four thousand feet.

The authority of the Council of the City of Wheeling to enact the ordinance adopted on November 23, 1954, cannot, under the prior holdings of this Court, be gainsaid. In appraising the validity of the ordinance of the City of Wheeling, we must, under the holdings of this Court in *State ex rel. Bibb* v. *Chambers, supra; LaFollette* v. *City of Fairmont*, 138 W. Va. 517, 76 S. E. 2d 572; *State ex rel. Armbrecht* v. *Thornburg*, 137 W. Va. 60, 70 S. E. 2d 73; *Woodall* v. *Darst*, 71 W. Va. 350, 77 S. E. 264, 80 S. E. 367, 44 L.R.A. (N.S.) 83, accept the findings of the Council of the City of Wheeling, hereinabove set forth, which may be summarized as follows: (1) That it will be to the best interest of the residents of the City of Wheeling, County of Ohio, and State of West Virginia, for the City of Wheeling to construct and establish the proposed bridge and tunnel facility, connecting U. S. Route No. 40 with Market Street at Ninth Street in the City of Wheeling, and providing for a direct connection with the new Ohio River Bridge, together with the necessary approaches and appurtenances thereto, and all facilities for the operation thereof; (2) that the estimated net earnings from the proposed project over and above the necessary cost of operating and maintaining the same will be sufficient to pay the principal of and interest on all bonds issued pursuant

to the ordinance and make all reserve, sinking fund and other payments provided for in the ordinance; (3) that the principal of and interest on the bonds to be issued pursuant to the ordinance, and all of the reserve, sinking fund and other payments provided for by the ordinance shall be paid solely from the revenues derived from the operation of the project by the City of Wheeling, and the bonds issued pursuant to the ordinance shall not constitute a debt or charge against the State of West Virginia, County of Ohio, or City of Wheeling, or any political subdivision of the State; and (4) that the project shall be constructed and established substantially in accordance with the plans and specifications of the consulting engineers at an estimated cost of twelve million dollars, which cost shall be deemed to include the cost of labor, materials, equipment, contractors' bonuses and extras, if any, furnishings, and all lands, and any interest therein, and of any other properties, real, personal or mixed, tangible or intangible, necessary, appurtenant or incidental to the construction and establishment of said project; interest on the revenue bonds proposed to be issued pursuant to the ordinance prior to and during and for six months after the completion of said project, to the full extent that revenues or other funds available are insufficient therefor; engineering expenses, legal expenses, expenses for estimates of cost and of revenues; advertising expenses; contingent expenses; fees for financial services; expenses for plans, specifications and surveys; administrative expenses of the City and the cost of operation and maintenance of said project for a reasonable period after the completion thereof, in such amounts as shall be certified to be necessary therefor by the consulting engineers; discount, if any, upon the sale of said bonds, the cost of insurance prior to the completion of the project; and such other expenses as may be necessary to the financing authorized by the ordinance and the construction and establishment of the project; and the placing of same in operation.

In addition to the condition contained in the letter of the State Road Commission of West Virginia to the Manager

of the City of Wheeling, dated December 15, 1954, that the state road commission retains the right to approve the design geometric, general location and specific terminal connection, the approval of the state road commission is subject expressly to two conditions: (1) A determination in a proper court of law as to the authority of the state road commission to approve the proposed project; and (2) that the approval does not in any way obligate The State Road Commission of West Virginia, or the State of West Virginia, to the expenditure of any funds, or constitute a financial responsibility of any kind or character.

The powers and duties of the state road commission to approve the proposed projects constructed under the provisions of Chapter 27 appears clearly from the provision of Section 1 of the Act. Section 1 contains the proviso that "no bridge shall be constructed, established or operated, over and across any navigable river, without compliance with the requirements, conditions and provisions provided by the Congress of the United States and the laws of the United States, nor without approval of the state road commission of this state."

As this record concerns only the question whether the proposed tunnel and bridge facility, connecting the eastern terminus of the new Ohio River Bridge at Ninth and Market Streets in the City of Wheeling with the designated point on U. S. Route No. 40, the National Road, may be deemed an "approach" to the new Ohio River Bridge within the holding of this Court in the case of *State ex rel. Knight* v. *Hanway, supra,* and nothing in the record indicates whether Wheeling Creek is a navigable stream, the approval of the state road commission seems unnecessary to the validity of the ordinance of November 23, 1954, and the issuing of the bonds provided for therein. Assuming, however, for the purpose of determining the validity of the proposed revenue bonds that Wheeling Creek is a navigable stream, the state road commission, under the express provision of Section 1 of the statute, is authorized to give approval to the project, as set forth in the letter of the commission, dated December 15, 1954.

That the authority granted to the City of Wheeling and other municipal corporations by Chapter 27 is not violative of the provisions of Section 8, Article X, of the West Virginia Constitution, which section limits the bonded indebtedness of county, city, school district, and municipal corporations, appears from the provision contained in Section 1 of Chapter 27, which provides that an incorporated city "is authorized and empowered to borrow money by means of bonds payable from revenues, or otherwise * * * a sum of money sufficient and necessary to pay all costs of construction of such bridge, including approaches thereto." Section 3 of the statute provides that a loan made under Chapter 27 shall be "subject only to this limitation, that the bonds or other evidences of indebtedness issued or given as security therefor shall be payable solely out of the revenues of such bridge." Section 4 provides that if the bonds, or other evidences of indebtedness, issued under the provisions of Chapter 27 are not secured by a mortgage or deed of trust on the bridge acquired from the sale of such bonds, or other evidences of indebtedness, "there shall be, and there is hereby, created a statutory mortgage lien upon the bridge and approaches * * * which shall exist in favor of the holder of said bonds, and each of them, and to and in favor of the holder of the coupons attached to said bonds," and from the express provisions of the ordinance adopted on November 23, 1954, "That the principal of and interest on the Bonds to be issued pursuant to this ordinance and all of the reserve, sinking fund and other payments provided for in this ordinance, will be paid solely from the revenues derived from the operation of said Project by the City of Wheeling and the bonds issued pursuant to this ordinance shall not constitute a debt or charge against the State of West Virginia, or the County of Ohio, or the City of Wheeling or any political subdivision of said State."

In point 1 of the syllabus of *Warden* v. *City of Grafton, supra,* this Court held: " 'Revenue bonds' issued by a municipality in conformity with Chapter 68 of the Acts of the Legislature of 1935, are not an indebtedness of the

municipality under either Section 8 of Article X of the Constitution or under Code, 13-1-3." *State ex rel. Knight* v. *Hanway, supra; State ex rel. Bibb* v. *Chambers, supra.* The rule applied to the statute in the *Warden* case applies to the statute here under consideration. By the enactment of Chapter 27, the Legislature evidenced a clear legislative intent that the payment of the bonds issued under the provisions of the statute shall be made solely from tolls and income derived from the project to be constructed, and that the bonds and coupons thereto do not represent a direct indebtedness of the City of Wheeling, so as to come within the limitation contained in the provisions of Section 8 of Article X of the Constitution of West Virginia.

For the foregoing reasons we hold: (1) That Chapter 27, Acts of the Legislature, Second Extraordinary Session, 1933, is valid and constitutional as being within the reasonable exercise and valid delegation of the police power of the State; (2) that the ordinance adopted by the Council of the City of Wheeling on November 23, 1954, is valid as constituting the reasonable exercise of the police power of the State, delegated to the City of Wheeling and other municipalities by the Legislature by the enactment of Chapter 27, Acts of the Legislature, Second Extraordinary Session, 1933; (3) that the proposed bridge and tunnel facility will, if and when completed, constitute an approach to the new Ohio River Bridge, within the provisions of Chapter 27, Acts of the Legislature, Second Extraordinary Session, 1933, and that the City of Wheeling is vested with power to construct and pay for the same from proceeds derived from the revenue bonds to be issued under the ordinance of November 23, 1954, it appearing from the record that the proposed approaches embraced in the proposed project are, within the holding of this court in point 2 of the syllabus of *State ex rel. Knight* v. *Hanway, supra,* "reasonably necessary to the full use and capacity of the bridge [the new Ohio River Bridge] and the maximum safety in the use thereof"; (4) that the revenue bonds, the issuance of which is provided for by the ordinance of November 23, 1954, when signed by the Mayor of the City

of Wheeling and countersigned by the respondent Clerk of the City of Wheeling, as directed by the ordinance adopted by the Council of the City of Wheeling, shall, when issued, be valid obligations of the City of Wheeling for the purpose for which they are issued; (5) that under the provisions of Chapter 27, Acts of the Legislature, Second Extraordinary Session, 1933, and the ordinance adopted by the Council of the City of Wheeling on November 23, 1954, the revenue bonds provided for by the ordinance, when signed by the Mayor and the Clerk of the City of Wheeling, and issued in accordance with the provisions of the ordinance of November 23, 1954, do not constitute a debt of the City of Wheeling, The State Road Commission of West Virginia, the County of Ohio, or any political subdivision thereof; (6) that the authority granted to the City of Wheeling by Chapter 27, Acts of the Legislature, Second Extraordinary Session, 1933, is not violative of Section 8 of Article X of the Constitution of West Virginia; (7) that the grounds assigned by the respondent, August L. Dailer, Clerk of the City of Wheeling for his refusal to countersign the revenue bonds provided for in the ordinance adopted by the Council of the City of Wheeling on November 23, 1954, and the performance of such other administrative acts as will bring about the issuance of the bonds and the furtherance of the proposed project, are insufficient to sustain the respondent Clerk's refusal in that regard; and (8) that the respondent, August L. Dailer, Clerk of the City of Wheeling, has the mandatory duty under the allegations of the petition to countersign the revenue bonds provided for in the ordinance adopted by the Council of the City of Wheeling on November 23, 1954, and to perform such other administrative acts as will bring about the issuance of the bonds, and that such duty may be enforced by a writ of mandamus.

We therefore award the writ of mandamus prayed for.

*Writ awarded.*